**MONONGAHELA POWER COMPANY et al., Plaintiffs,**

**v.**

**Clifford L. ALEXANDER, Jr. et al., Defendants.**

**Civ. A. No. 78–1712.**

United States District Court, District of Columbia.

Dec. 19, 1980.

David I. Granger, and Barry J. Israel, Clifford, Glass, McIlwain & Finney, Washington, D. C., for plaintiffs.

Donald W. Stever, Jr. and F. Patrick Barry, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

JOHN LEWIS SMITH, District Judge.

Plaintiffs, three power companies, bring this action against the United States Army Corps of Engineers (the Corps) and various individuals acting in their official capacities. They seek injunctive and declaratory relief regarding the Corps' denial of their application for a permit for the Davis Pumped Storage Hydroelectric Project (the Project), a complex of dams designed to produce power. Prior to the Corps' denial, a license to construct and operate the Project had been issued by the Federal Power Commission (FPC), the predecessor of the Federal Energy Regulatory Commission (FERC).[1] Plaintiffs contend that the Corps is without jurisdiction to either grant or deny a permit for the Project, that the Corps is barred by principles of res judicata and collateral estoppel from denying a permit to a project already licensed by FPC, and that the hearing procedure conducted by the Corps violated their Due Process rights. The State of West Virginia and six conservation organizations were granted leave to intervene to brief the Court on state-related and environmental issues. Jurisdiction is properly founded upon 28 U.S.C. § 1331 (1976) and 5 U.S.C. §§ 701–03 (1976). The matter is before the Court on plaintiffs' joint motion and defendants' cross motion for summary judgment.

Plaintiffs' threshold contention, that the Corps is without jurisdiction to either grant or deny a permit, is based on the premise that Congress has vested all authority over

---

1. Unless the context demands otherwise, the energy licensing authority will be referred to as the FPC, rather than the FERC.

hydroelectric projects in the FPC and its successors, to the exclusion of any other federal agency. This comprehensive authority is dated back to the Federal Water Power Act of 1920, ch. 285, 41 Stat. 1063 (codified at 16 U.S.C. §§ 792 *et seq.* (1976)) (the Water Power Act). Defendants respond that the Corps has concurrent jurisdiction pursuant to Section 404 of the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500, 86 Stat. 816, 884 (codified at 33 U.S.C. § 1344 (Supp. III 1979)) (the FWPCAA). That section requires a permit issued by the Corps for any discharge of dredged or fill material into navigable waters, a process which construction of the Project would admittedly involve. Resolution of this apparent statutory conflict entails an inquiry into the origins and purposes of both Acts.

Prior to the enactment of the Water Power Act, federal control over water power was characterized by duplicative and overlapping regulatory jurisdiction. Authority to license water power projects was shared among three agencies: the Department of Interior, the Department of Agriculture, and the Secretary of War. J. Kerwin, *Federal Water Power Legislation* 107 (1926). The Water Power Act was intended to coordinate the exercise of federal jurisdiction, H.R.Rep.No.61, 66th Cong., 1st Sess. 5 (1919); and to that end the Act created the FPC with authority over federal water power projects. *See* 41 Stat. 1063 (1920).

■ At the time of its passage, the Water Power Act was administratively interpreted as concentrating all licensing authority in the FPC and providing "a complete and detailed scheme for the development ... of all the water power resources of the public domain." 32 Op. Att'y Gen. 525, 528 (1921). The FPC's general counsel concluded that "it was the purpose of Congress to confer exclusive jurisdiction on the Federal Power Commission ... over the matter of issuing licenses" for hydroelectric power projects. 1 FPC Ann.Rep. 156 (1921). This contemporaneous construction by the administering agency, combined with similar subsequent interpretations, is enti-

tled to "great respect." *Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1074–75, 43 L.Ed.2d 279 (1975).

During the existence of the FPC, the courts interpreted this authority in the same manner. Prominent among the decisions is *First Iowa Hydroelectric Cooperative v. FPC*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), in which the Court examined the purposes and powers of the Water Power Act and found that

It was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted. *Id.* at 180, 66 S.Ct. at 919.

Courts at other times have used comparable language, emphasizing that the purpose of the Act was to provide for "comprehensive control" over water resources, *FPC v. Union Electric*, 381 U.S. 90, 98, 85 S.Ct. 1253, 1257, 14 L.Ed.2d 239 (1959); to "centralize the authority" over water resources in one Government agency, *Northwest Paper Co. v. FPC*, 344 F.2d 47, 51 (9th Cir. 1965); and to give the FPC "exclusive jurisdiction." *United States v. Idaho Power Co.*, 85 F.Supp. 913, 915 (D.Id.1949).

Congress itself has also construed the authority of the FPC as exclusive. When the authority was transferred to FERC pursuant to the Department of Energy Organization Act of 1977, Pub.L.No. 95–91, § 402(a)(1), 91 Stat. 565, 584 (codified at 42 U.S.C. § 7172(a)(1) (Supp. III 1979) (the Energy Organization Act)), Congress stated in the Conference Report that:

Section 402(a) describes the exclusive jurisdiction of the Commission over certain functions transferred from the FPC. This exclusive jurisdiction consists of functions transferred from the FPC which will be within the sole responsibility of the Commission to consider and to

take final agency action on without further review by the Secretary or any other executive branch official.

H.R.Rep.No. 539, 95th Cong., 1st Sess. 75 (Conference Report), *reprinted in* [1977] U.S.Code Cong. & Ad.News 854, 925, 946. Specifically included in this "exclusive jurisdiction" is power to issue licenses for hydroelectric projects. Energy Organization Act, § 402(a)(1)(A), 91 Stat. 584 (codified at 42 U.S.C. § 7172(a)(1)(A) (Supp. III 1979)).

While defendants and intervenors dispute the label "exclusive," and while the language used to describe the FPC's authority does vary, the reach of its jurisdiction prior to 1972 was clear. Congress had created an agency and centralized in it *all* federal authority for licensing federal water power projects. This exclusive licensing authority preempted any conflicting state regulation, *see First Iowa Hydroelectric*, 328 U.S. at 181–82, 66 S.Ct. at 919–20, and precluded any concurrent federal jurisdiction. This historic statutory policy was apparently reaffirmed at the time of the passage of the Energy Organization Act. Were it not for the existence of the FWPCAA, there would be no difficulty in holding that the FPC's power here was exclusive.

However, the FWPCAA does exist and does disrupt the otherwise clear statutory mandate of the FPC. Section 404 of the FWPCAA, 33 U.S.C. § 1344 (Supp. III 1979), gives the Corps power to grant or deny permits for discharges of "dredged or fill material" into navigable waters. There is no exception for FPC-licensed hydroelectric projects. Since the Project concededly requires such a discharge, the Corps asserts that it, as well as the FPC, has the duty and the authority to license the project. Defendants contend that had Congress intended to preserve the FPC's exclusive licensing procedure, it could easily have done so and that the absence of an exemption in the 1972 FWPCAA is indicative of Congressional intent to give the Corps the power disputed here. They argue that this construction is further strengthened by the Clean Water Act of 1977, in which Congress passed a number of specific exemptions to

the Corps' licensing authority but again failed to exempt hydroelectric projects. Pub.L.No. 95–217, § 67, 91 Stat. 1566, 1600–06 (codified at 33 U.S.C. § 1344(f) and (r) (Supp. III 1979)). This omission in 1977 is all the more striking in that Congress was on notice that the FWPCAA had been construed as applicable to water power projects. *See Scenic Hudson Preservation Conference v. Calloway*, 370 F.Supp. 162 (S.D.N.Y.1973), *aff'd per curiam* 499 F.2d 127 (2d Cir. 1974) (discussed more fully *infra*). The seemingly inevitable conclusion is that Congress, by not exempting FPC-licensed projects, intended them to be subject to the Corps' licensing jurisdiction.

That, indeed, was the holding in the only case which has confronted the apparent conflict between the FPC's exclusive jurisdiction and the Corps' general authority:

Con Ed would infer an exception from the [FWPCAA] for hydroelectric plants on the theory that Congress could not have intended to interfere with the jurisdiction of the FPC in view of the long settled policy, discussed above, of allowing that agency unique control over the production of hydroelectric power. The argument is persuasive at first blush, but even more plausible is plaintiffs' contention that Congress would not design an Act which on its face is all-inclusive, but for specifically enumerated exceptions, and yet intend to establish an unmentioned exception of the scale suggested here. Without any indication that Con Ed's reading of the Congressional will is accurate, the carving out of so major an exception would be improper. If this was Congress' intention and the omission is mere oversight, the remedy rests in Congress' hands . . . .

*Scenic Hudson Preservation Conference v. Calloway*, 370 F.Supp. 162, 170 (S.D.N.Y. 1973). This finding was affirmed in a per curiam opinion describing the District Court's opinion as "well-considered." 499 F.2d at 128. While such a precise holding would normally govern any disposition here, two intervening events have diminished its authority.

First, Congress has now given an indication that the FPC's hydroelectric jurisdiction should be construed as exclusive, notwithstanding the FWPCAA. *See* H.R. Rep.No.539, *supra.* Although the statement clearly describes the FPC jurisdiction as exclusive, and was made after both the FWPCAA and the decision in *Scenic Hudson*, it is difficult to determine the weight it should be accorded. Had the Energy Organization Act actually created the FPC power at issue here, the Conference Report language would be controlling. The FPC's power would be exclusive, whatever duplicative licensing power the Corps might have possessed would have been repealed,[2] and the decision in *Scenic Hudson* overruled. If, on the other hand, the statement were merely a legislative comment upon a previously enacted statute, it would still be entitled to "some consideration as a secondarily authoritative expression of expert opinion." *Bobsee Corp. v. United States*, 411 F.2d 231, 237 n.18 (5th Cir. 1969); 2A Sands, *Statutes and Statutory Construction*, § 49.11, at 266 (4th ed. 1973); *see Esquire, Inc. v. Ringer*, 591 F.2d 798, 803 (D.C.Cir.1978). While allowing the statement even this minimal consideration would cast doubt upon the continuing validity of *Scenic Hudson*, the better course is to interpret its authority as somewhere between the two extremes. The Energy Organization Act did not simply transfer to FERC certain powers of the FPC; it created additional ones and consolidated others. It was a sweeping transformation of the entire field of energy regulation. As such, the statement is as much an indication of the jurisdiction Congress intended to allocate to FERC in 1977 as it is an expression of its understanding of prior legislation. Although it did not, perhaps, conclusively overrule *Scenic Hudson*, nor repeal whatever concurrent jurisdiction the Corps may have had under the FWPCAA, the statement is sufficiently authoritative to undermine the precedential value of the contrary conclusion in *Scenic Hudson*.

The second intervening event was *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), where the Supreme Court ruled that there do exist inferable exceptions to the facially inclusive licensing authority vested by the FWPCAA in the Corps. The FWPCAA was found inapplicable to the discharge of nuclear pollutants, the regulation of which the Atomic Energy Commission (AEC) considered within its sole jurisdiction. The Court noted that the regulatory authority of the AEC was "comprehensive," *id.* at 5, 96 S.Ct. at 1940, and preemptive of any state regulation. *Id.* at 15–16, 96 S.Ct. at 1944–45. It further noted that it would expect a "clear indication of legislative intent" to change such a "pervasive regulatory scheme." *Id.* at 24, 96 S.Ct. at 1948. Examining the relevant legislative history, it then found that Congress had specifically intended to preserve the preexisting regulatory plan. *Id.* If there were similar legislative history in the FWPCAA preserving the jurisdiction of the FPC, *Train* would obviously be controlling. However, no such history can be found and that crucial distinction allows each side to claim *Train* as its own. Defendants contend that the case allows this Court to look only to the legislative history of the FWPCAA to find an exemption for hydroelectric projects. Since no such exemption can be found, none could have been intended, just as *Scenic Hudson* concluded. Plaintiffs insist, conversely, that *Train* overrules *Scenic Hudson* by implication, and this appears the better argument.

The key lies in the three-step approach implicit in the Court's analysis in *Train*. First, there must be a comprehensive or pervasive regulatory plan which is threatened with change by a subsequent statute. *Train*, 426 U.S. at 24, 96 S.Ct. at 1948. If such a situation exists, the Court will next search for Congressional intent to preserve the preexisting regulatory framework, a

---

**2.** Defendants and Intervenors have questioned whether the Energy Organization Act should be construed as repealing by implication the concurrent jurisdiction of the Corps. Because of the Court's disposition of the issue of the Corps' jurisdiction, that question need not be dealt with.

search which was successful in *Train*. Not finding any intent to preserve, a third step would be necessary before the Court would recognize any change in an established regulatory plan: it would look for and normally expect to find a specific Congressional intent to make such a change. *Id.* This third step of the analysis is based on long-established law, *see United States v. United Continental Tuna Corp.*, 425 U.S. 164, 169, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976); *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936), but is an approach *Scenic Hudson* failed to use. The only burden assumed there was searching for an intent to preserve the FPC's jurisdiction through an exemption from the FWPCAA. To the extent that *Scenic Hudson* looked no further, *Train* must be seen as modifying its result.

However, even the third step implicit in the *Train* analysis does not dispose of the dispute here. Although the regulatory scheme administered by the FPC is as comprehensive and pervasive as the nuclear regulation at issue in *Train*, the legislative history of the FWPCAA reveals neither an intent to preserve the FPC jurisdiction, nor an intent to change it. Thus to resolve the statutory conflict other principles of statutory construction must be examined.

 The first principle applicable is the "cardinal rule" that repeals by implication are not favored. *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (quoting *Posadas v. National City Bank*, 296 U.S. at 503, 56 S.Ct. at 352); *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission*, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968). That is undoubtedly the situation here. If the Corps' concurrent and duplicative jurisdiction over FPC-licensed projects is found valid, the statutory policy of centralized, coordinated licensing procedures for such projects, dating back to 1920, will be repealed. There is also no doubt that the repeal would be by implication since there is no evidence that Congress specifically and consciously intended to effect such a repeal. Under such

circumstances the second applicable precept is that a court can find an implied repeal only if the two statutes are "irreconcilable," *Morton v. Mancari*, 417 U.S. at 550, 94 S.Ct. at 2482; or clearly "repugnant." *United States v. Borden Co.*, 308 U.S. 188, 198–99, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939); *see also TVA v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). In essence, then, the Court's duty here is to compare the two statutes in purpose and operation, to attempt to give effect to both, and to repeal the exclusive authority of the FPC only if it is clearly repugnant to the purpose and operation of the FWPCAA.

An analysis of the sets of factors used by the two agencies in reaching determinations under the respective statutes reveals no substantial or overriding differences. The operation of the FWPCAA requires that before the Corps issues a permit under Section 404, all relevant factors must be carefully weighed and the benefits balanced against the detriments. These factors include "conservation, *economics*, esthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, naviation, recreation, water supply, water quality, *energy needs*, safety, food production, and, in general, the needs and welfare of the people." 33 CFR § 320.4(a) (1979) (emphasis added). A permit will only be granted if it is in the "public interest." *Id. See also* W. Rodgers, *Environmental Law* § 4.7, at 407 (1977). The Corps must also consider whether the benefits of the project outweigh the damage to wetlands. 33 CFR § 320.4(b)(4) (1979).

The operation of the FPC under its exclusive statutory authority has been described by the Supreme Court:

The question whether the proponents of a project "will be able to use" the power supplied is relevant to the issue of the public interest. So too is the regional need for the additional power. But the inquiry should not stop there. A license under the Act empowers the licensee to construct, for its own use and benefit, hydroelectric projects utilizing the flow

of navigable waters and thus, in effect, to appropriate water resources from the public domain. The grant of authority to the Commission to alienate federal water resources does not, of course, turn simply on whether the project will be beneficial to the licensee. Nor is the test solely whether the region will be able to use the additional power. The test is whether the project will be in the public interest. And that determination can be made only after an exploration of all issues relevant to the "public interest," including future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife.

The need to destroy the river as a waterway, the desirability of its demise, the choices available to satisfy future demands for energy—these are all relevant to a decision.

*Udall v. FPC*, 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967). Moreover, the FPC has adopted as part of its decision-making process the guidelines and goals of the National Environmental Policy Act, 42 U.S.C. §§ 4321–47 (1976) (NEPA). *See* 18 C.F.R. §§ 2.80–2.81 and App. A (1979). That procedure echoes the balancing process used by the Corps in Section 404 permit applications. *See*, Rodgers, *supra* at 407. Specifically included among the factors which must be reported to and evaluated by the FPC are "areas of critical environmental concern, e. g., wetlands" 18 C.F.R.App. A § 2.2.3, at 137 (1979). Finally, the FPC also uses its own regulations on conservation of natural resources, *see id.* at § 2.14, which were issued pursuant to the Federal Power Act, 16 U.S.C. §§ 791a–825r (1976), a successor to the Water Power Act. It is thus apparent that each agency evaluates approximately the same elements in arriving at the ultimate goal of the public interest. Consequently, the operations of each agency under the relevant statutes are neither irreconcilable nor repugnant to each other.

Even allowing that the operations may be similar, defendants nevertheless assert that the purposes and goals of each agency under the respective statutes are so different as to be inconsistent. They contend, citing *Scenic Hudson*, that although the FPC may review the same environmental factors as the Corps, it is not required to do so. This is not entirely accurate. The Supreme Court and other courts have consistently held that such factors are relevant to an FPC decision and *must* be considered. *NAACP v. FPC*, 425 U.S. 662, 670 & n.6, 96 S.Ct. 1806, 1811 & n.6, 48 L.Ed.2d 284 (1976) (consideration of environmental and conservation questions a subsidiary purpose of the Act); *Udall v. FPC*, 387 U.S. at 450, 87 S.Ct. at 1724 (FPC determination can only be made after exploration of all relevant issues including recreation, wildlife, and wilderness preservation); *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608, 614 (2d Cir. 1965) (statutory phrase "recreational purposes" encompasses conservation of natural resources and maintenance of natural beauty). It should also be noted that while environmental factors are specifically relevant to the FPC's determination of the public interest, many other national statutory policies are beyond its consideration. *NAACP v. FPC*, 425 U.S. at 670, 96 S.Ct. at 1811. In addition, NEPA requires the FPC to consider the relevant environmental factors. *Greene County Planning Board v. FPC*, 455 F.2d 412, 418–20 (2d Cir. 1972).

■ Defendants' objections are thus reduced to the proposition that while both agencies may be required to consider approximately the same factors, the Corps is required to weigh more heavily the environmental issues, especially those concerning preservation of wetlands. This difference in perspective is attributed to the disparity between the purposes of the statutes: the Water Power Act's prime orientation is power development while the FWPCAA's is preservation of water resources. Although this difference is not insignificant, the similarities in purpose and operation are more persuasive. The Court's duty here is to repeal the FPC's exclusive authority only if it is positively repugnant to or irreconcila-

ble with the FWPCAA. Given the FPC's substantial environmental responsibilities, it cannot fairly be said that the difference in emphasis and perspective of the FWPCAA rises to a level sufficient to support an implied repeal. Accordingly, an exemption for FPC-licensed projects from the licensing requirements of the FWPCAA must be inferred. The Court finds that the Corps was therefore without jurisdiction to either grant or deny the permit at issue here.

An appropriate order follows.

### ORDER

The Joint Motion of Plaintiffs for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, having been presented, and the Court being fully advised, this Court declares that the United States Army Corps of Engineers is without jurisdiction either to grant or deny a permit for construction of the Davis Project pursuant to 33 C.F.R. § 1344 because the Davis Project has been licensed previously by the Federal Energy Regulatory Commission which possesses exclusive jurisdiction over such projects, and

IT APPEARING that there is no genuine issue as to any material fact and that plaintiffs are entitled to summary judgment as a matter of law, it is hereby

ORDERED: that plaintiffs' motion for summary judgment be hereby granted.