COMMONWEALTH OF MASSACHU-SETTS, By its DEPARTMENT OF PUBLIC WELFARE, Petitioner,

v.

DEPARTMENTAL GRANT APPEALS BOARD OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Respondents.

COMMONWEALTH OF MASSACHU-SETTS, By its DEPARTMENT OF PUBLIC WELFARE, Plaintiff, Appellant,

v.

DEPARTMENTAL GRANT APPEALS BOARD OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants, Appellees.

Nos. 82–1403, 86–1064.

United States Court of Appeals, First Circuit.

Argued June 2, 1986.

Decided March 30, 1987.

---

Coffin, Circuit Judge, concurred and filed opinion.

**780**

Stephen S. Ostrach, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for Com. of Mass.

Elizabeth A. Pugh, Dept. of Justice, Civ. Div., with whom Richard K. Willard, Asst. Atty. Gen., Washington, D.C., William F. Weld, U.S. Atty., Boston, Mass., and Anthony Steinmeyer, Dept. of Justice, Civ. Div., Washington, D.C., were on brief, for Departmental Grant Appeals Bd.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

In this case, the Commonwealth of Massachusetts seeks reimbursement from the United States Department of Health and Human Services (HHS) for the expense of providing Medicaid abortions admittedly falling within the proscription of the Hyde Amendment, but which this court had ordered the Commonwealth to provide during the pendency of earlier litigation sparked by the Hyde Amendment. The district court granted HHS's motion for summary judgment. The Commonwealth bases its appeal of this decision on contractual, statutory, equitable and procedural grounds. HHS has also chosen to attack the district court judgment, arguing that the district court was without jurisdiction to consider a case seeking monetary relief against the United States since such cases are within the exclusive jurisdiction of the United States Claims Court.[1]

## I. PRIOR HISTORY

The factual background for this case can be found in the proceedings culminating in *Preterm, Inc. v. Dukakis*, 591 F.2d 121 (1st Cir.), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979). In that case, a clinic which provided Medicaid abortion services challenged a provision in the fiscal 1979 Massachusetts budget which restricted the Commonwealth's payment of Medicaid abortions to cases of rape or incest or where the abortion was necessary to prevent the death of the mother. At that time and for several previous years, federal law prohibited the use of any appropriated funds to perform abortions except where necessary to protect the health of the mother and, in different years, in certain other circumstances. This restriction was contained in annual appropriations to the Department of Health, Education and Welfare (now HHS) and is generally referred to as the Hyde Amendment. At the time of the *Preterm* suit, the Hyde Amendment was less restrictive than the similar state provision. In the district court, Preterm obtained an order requiring the Commonwealth to fund Medicaid abortions to the full extent of federal funding, thus limiting the state provision to the extent it was more restrictive than the Hyde Amendment. Preterm, however, had also argued in the district court that the Medicaid statute prohibited the state from refusing to fund other medically necessary abortions, even though Congress had, through the Hyde Amendment, prohibited the use of *federal* funds for such purposes. This argument was rejected by the district court and Preterm appealed.

While the appeal was pending, we issued an injunction ordering the Commonwealth to fund all medically necessary abortions for Medicaid-eligible women. Subsequently, we issued our opinion finding that the Medicaid Act as amended by the Hyde Amendment did not require states to pro-

---

* Of the Fifth Circuit, sitting by designation.

1. The United States Court of Claims was renamed the United States Claims Court in 1982.

vide all medically necessary abortions and bear the entire financial burden for such services. 591 F.2d at 132–34. Nonetheless, we allowed the previously issued injunction to remain in effect pending disposition of Preterm's petition for certiorari. Approximately fourteen months later, Preterm's petitions for certiorari and rehearing had been denied and the injunction was lifted.

After some preliminary skirmishing which we need not recount here, the Commonwealth applied to HHS for reimbursement for the abortions provided under the court order. Reimbursement was disallowed by both HHS and the Departmental Grant Appeals Board. The Commonwealth then filed two separate actions seeking review of this disallowance, one in this court and one in the United States District Court for the District of Massachusetts, because it was not clear at that time which was the proper forum for review of such disallowances. We stayed the action filed in this court until the action filed in the district court came up for review. The district court granted HHS' motion for summary judgment, finding no financial liability on the part of HHS for costs incurred by the Commonwealth under this court's order. The two appeals are now consolidated before us.

We decide this case largely, though not exclusively, on the issues of jurisdiction and sovereign immunity. HHS' failure to raise these issues before the district court is not fatal to its challenge here. Both issues may be litigated at any time before a case is finally decided. *See People of California v. Quechan Tribe of Indians,* 595 F.2d 1153, 1154 n. 1 (9th Cir.1979) (citing 14 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* 156–58 (1976) (sovereign immunity); *Eisler v. Stritzler,* 535 F.2d 148, 151 (1st Cir.1976) (subject matter jurisdiction). The Commonwealth had invoked federal question jurisdiction under 28 U.S.C. § 1331.[2] It relied on the waiver of sovereign immunity found in the

Administrative Procedure Act (APA), 5 U.S.C. § 702 (1982), to allow it to sue a government agency in the district court. HHS argues that the waiver of sovereign immunity contained in the APA does not extend to actions of this kind, which it claims are within the exclusive jurisdiction of the Claims Court under the Tucker Act, 28 U.S.C. § 1491 (1982), and the APA itself. We will discuss separately the related questions of district court and Claims Court jurisdiction.

## II. DISTRICT COURT JURISDICTION

### A. 5 U.S.C. § 702

In order to establish the jurisdiction of a court over a suit against the United States, it must be shown that the court has subject matter jurisdiction of the issues raised by the suit, that the United States has waived its immunity for suits of that kind, and that the United States has consented to be sued in the particular court. "The United States, as sovereign, is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941).

Subject matter jurisdiction and waiver of sovereign immunity were granted to claims for nonmonetary relief for unlawful actions of federal agencies, or their officers or employees, by the 1976 amendments to 5 U.S.C. § 702 and 28 U.S.C. § 1331. Section 1331, as amended, abolished the amount-in-controversy requirement for claims against the United States. Section 702, not itself an independent source of jurisdiction, waived the defense of sovereign immunity for claims arising under § 1331 not involving monetary relief. 5 U.S.C. § 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An

---

**2.** Section 1331 provides:

The district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States.

action in a court of the United States seeking *relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Emphasis added.) Congress intended by the combination of the "1976 amendments to § 702 of the APA and 28 U.S.C. § 1331 to make § 1331 the vehicle for actions 'seeking relief other than money damages....'" *B.K. Instrument Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983); *See also* H.R.Rep. No. 94–1656, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News, 6121, 6123–24.

We must first determine which claims are not covered by district court jurisdiction under § 702 due to the qualification "other than money damages." The D.C. Circuit, in *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1447 (D.C.Cir.1985), held that "money damages" should be understood in line with the common law understanding of such damages as distinct from all forms of specific relief, including monetary relief. The court admitted that "it is possible" that the terms "other than money damages" might be understood to exclude those cases which come under the Tucker Act, an Act which "seems

to have drawn a line between monetary relief (whether awarded as damages or not) and nonmonetary relief." *Id.* Yet, it found nothing in the legislative history to indicate that "Congress had this obscure feature of Tucker Act jurisdiction in mind." *Id.*

■ The legislative history can, and we think should, be read otherwise. *See, e.g.,* H.R.Rep. No. 94–1656, *reprinted in* 1976 U.S.Code Cong. and Ad.News 6121, 6131:

The first of the additional sentences [in § 702] provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. *The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.).* Thus, limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act, or similar statutes are unaffected.

(Emphasis added.) This passage clearly uses the terms "money damages" and "monetary relief" interchangeably and opposes money in general to "specific relief." It also disavows any intent to affect Tucker Act jurisdiction. Another passage identifies "monetary liability" and "money damages" and opposes them to other forms of relief; it also explicitly mandates that we interpret § 702 in light of the Tucker Act:

Congress has made great strides toward establishing monetary liability on the part of the Government for wrongs committed against its citizens by passing the Tucker Act of 1875, 28 U.S.C. sections 1346, 1491, and the Federal Tort Claims Act.... S. 800 [*i.e.,* the amendments to 28 U.S.C. § 1331 and 5 U.S.C. § 702] would strengthen this accountability by withdrawing the defense of sovereign immunity in actions seeking *relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus.* Since S. 800 would be limited only to actions of this type for specific relief, the recovery of money damages contained in the Federal Tort

Claims Act and the Tucker Act governing contract actions would be unaffected. *Id.* at 6124–25 (emphasis added). The report contains other similar references. The Tucker Act, "obscure features" and all, was left intact by § 702, at least according to the House Report. This view of § 702 is further confirmed by a reading of the memorandum by Roger C. Cramton, Dean of the Cornell Law School, the memorandum upon which the House Report is largely based. This memorandum stated as follows:

> Although the recommendation does not use the terms "specific relief," the principal effect of the amendment will be to cut off the defense of sovereign immunity in suits for specific relief. Perhaps ninety per cent of the cases affected will be suits for injunction or declaratory judgment or for both and perhaps most of the rest will be suits for relief in the nature of mandamus. *But all other specific relief is covered, including specific performance, quieting title, ejectment and habeas corpus. All forms of monetary relief, however, are excluded from the recommendation.*

*Sovereign Immunity: Hearing before the Subcommittee on Administrative Practice and Procedure of the Committee of the Judiciary, U.S. Senate, S. 3568, 91st Cong., 2d Sess.* 92, 118 (1970) (emphasis added). In light of this legislative history, we must reject the *Maryland Department of Human Resources* interpretation of the statute.[3] We read the words "money damages" to mean any monetary relief, whether it is in the nature of damages or in the nature of specific relief. *See New Mexico v. Regan,* 745 F.2d 1318, 1321 n. 3 (10th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *State of Minnesota by Noot v. Heckler,* 718 F.2d 852, 858–59 (8th Cir.1983).

■ In the present case, the Commonwealth sought monetary relief in the form of reimbursement from the Department of Health and Human Resources. To be sure, the Commonwealth claims that it seeks not monetary, but, rather, declaratory relief, *viz.,* a declaration that the cost of the court-ordered abortions is a reimbursable Medicaid expense. District courts may properly assert jurisdiction over claims seeking declaratory relief even when those claims may later form the basis for money judgments. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595 (1978); *Sarasota, Fla. v. E.P.A.,* 799 F.2d 674 (11th Cir.1986); *Hahn v. United States,* 757 F.2d 581, 589–90 (3d Cir.1985); *Laguna Hermosa Corp. v. Martin,* 643 F.2d 1376, 1379 (9th Cir.1981).

The Commonwealth's jurisdictional arguments, however, do not match its actual claim for relief. A request for a declaratory judgment may not be used to give district courts jurisdiction over claims whose "prime objective" is monetary relief. *B.K. Instrument,* 715 F.2d at 727. *See also Hahn v. United States,* 757 F.2d at 589; *United States v. City of Kansas City, Kansas,* 761 F.2d 605, 608 (10th Cir.1985). In its brief on the merits, the Commonwealth concludes by stating that "[t]he three decisions of the Grant Appeals Board under review should be reversed and the matter remanded for calculation of how much further reimbursement is due the Commonwealth." Petitioner's brief at 48.

---

3. The D.C. Circuit, 763 F.2d at 1447–48, found especially compelling the fact that the House and Senate Reports mentioned litigation involving federal grant-in-aid programs as problematic under the old sovereign immunity doctrine. *See, e.g.,* H.R.Rep. No. 1656, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad. News 6121, 6129. Such litigation, in the D.C. Circuit's view, would primarily be seeking specific monetary relief. The source of the congressional discussion, however, was Dean Cramton's memorandum. As the passage we have cited shows, that memorandum recommended excluding monetary relief from § 702. As law reformer, Dean Cramton was anxious to do away with the "patchwork" of doctrine in the sovereign immunity context and cited the various stratagems devised by courts to circumvent archaic rules. He contended, however, that the package of amendments to §§ 1331 and 702, in conjunction with existing provisions, such as the Tucker Act, would serve to regularize this doctrinal area. Dean Cramton's memorandum, and the congressional reports based on it, should not be cited as implying propositions that they clearly reject.

The Commonwealth, thus, is seeking an order awarding monetary relief.

In *State of Minnesota by Noot v. Heckler*, 718 F.2d 852 (8th Cir.1983), the Eighth Circuit found that insofar as the state sought to recover funds from HHS as reimbursement for disallowed Medicaid expenses, a claim quite similar to the one at hand, the case was within the sole jurisdiction of the Claims Court. District court jurisdiction was allowed only for claims which sought "prospectively-oriented declaratory relief." *Id.* at 857. No such claims are at issue here. Based on 5 U.S.C. § 702, therefore, we find that the district court did not have jurisdiction over the Commonwealth's claim because that claim sought monetary relief.

### B. 5 U.S.C. § 704

In light of our finding in Part III, *infra*, that the Claims Court may properly adjudicate the reimbursement claims presented by the Commonwealth, it has been suggested that 5 U.S.C. § 704 (1982) might also bar district court jurisdiction under the APA. Under § 704, judicial review may be had under the APA when "there is no adequate remedy in a court." The theory is that § 704 constitutes a limit on the judicial review granted by the APA when review is available elsewhere. *See American Science & Engineering, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir.1978); *Alabama Rural Fire and Ins. Co. v. Naylor*, 530 F.2d 1221, 1230 (5th Cir.1976); *International Engineering Co. v. Richardson*, 512 F.2d 573, 580 (D.C.Cir.1975), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976).

The legislative history of § 704 shows that Congress intended thereby to codify the existing law concerning ripeness and exhaustion of remedies. *See* Appendix to Attorney General's Statement Regarding Revised Committee Print of October 5, 1945, *reprinted in* Appendix B, S.Rep. No. 752, 79th Cong., 1st Sess., 38, 45 (1945); Moore, The Proposed Administrative Procedure Act, *reprinted in* 92 Cong.Rec., Part 2, 2159, 2163 (1946). The ripeness and exhaustion (finality) doctrines during that period often denied judicial review of government regulation before enforcement in particular cases. *See, e.g., United Public Workers v. Mitchell*, 330 U.S. 75, 89–93, 61 S.Ct. 556, 564–66, 91 L.Ed. 754 (1947). Such cases as *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), however, considerably loosened such requirements for review; the Court in *Abbott* found that § 704 was to be interpreted in an inclusive, rather than an exclusive, spirit. *Id.* at 140–41, 87 S.Ct. at 1510–11. In recent times, when courts have not "completely ignored" § 704, *see* K. Davis, Administrative Law Treatise 468 (1983), they have generally interpreted it broadly to allow judicial review in many circumstances which might otherwise have seemed excluded by its provisions. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 326–32, 96 S.Ct. 893, 898–901, 47 L.Ed.2d 18 (1976). *See generally* K. Davis, 455–72.

*Abbott* and similar cases do not touch on the precise application of § 704 at issue here. Section 704's broad language and its rather undefined idea of "adequacy," however, need to be carefully interpreted in light of particular circumstances. We think that the Claims Court will be able adequately to adjudicate the Commonwealth's claims in this case. Yet, we would be very reluctant to base our decision concerning district court jurisdiction on a statutory provision which was written with other purposes in mind and whose authority even with regard to those matters has been substantially qualified by subsequent judicial interpretation.

### III. CLAIMS COURT JURISDICTION

#### A. The "Exclusivity" of Claims Court Jurisdiction

■ We now consider the jurisdiction of the Claims Court over the reimbursement claim. We conduct this inquiry for the purpose of deciding whether we should transfer the case. *See* 28 U.S.C. § 1631 (1982). The Claims Court, of course, must ultimately "decide [its] own jurisdiction ... and cannot have it conferred on [it] by any other court." *Diamond v. United States*, 657 F.2d 1194, 1197 (Ct.Cl.1981), *cert. denied*, 459 U.S. 831, 103 S.Ct. 70, 74 L.Ed.2d

69 (1982). This inquiry must begin with a brief discussion of the nature of Claims Court jurisdiction under the Tucker Act. Having decided, however, that the district court did not have jurisdiction over the Commonwealth's claim for monetary relief, *see supra* Part II, our holding on Claims Court jurisdiction is, in principle, separable from that concerning the jurisdiction of the district court.

We turn, first, to the much-vexed question of the "exclusivity" of the jurisdiction granted by the Tucker Act.[4] It would appear to us that the inquiry into "exclusivity," while in some measure a semantic quarrel, *cf., Ghent v. Lynn*, 392 F.Supp. 879, 891 (D.Conn.1975), should be pursued somewhat differently in cases involving contractual and statutory claims. Specifically, we agree with the majority of authorities that the Claims Court has exclusive jurisdiction over claims "founded upon a contract" where the relief sought exceeds $10,000. However, where a claim may more properly be characterized as a § 702 case of official misconduct for which a district court may assert jurisdiction under 28 U.S.C. § 1331, courts should

> be careful not to subvert the congressional objectives underlying the enactment of the judicial review statute by allowing the government to give an overly expansive scope to the notion of claims "founded upon" contract.

*B.K. Instrument*, 715 F.2d at 727 (quoting Wright, Miller & Cooper, Federal Practice and Procedure § 4101 at 210–11; *See also Estate of Watson v. Blumenthal*, 586 F.2d 925, 929–30 (2d Cir.1978).

In the statutory context, a strict "exclusivity" position has been somewhat eroded by statutes which expressly grant district court jurisdiction for monetary claims regardless of amount. *See, e.g., Mar v. Kleppe*, 520 F.2d 867, 871 (10th Cir.1975) (rejecting contention that Claims Court jurisdiction for claims over $10,000 superseded express grant of district court jurisdiction for claims against the Small Business Administration "without regard to the amount in controversy" under 15 U.S.C. § 634(b)(1)). The Claims Court retains its "exclusive" jurisdiction, however, in the absence of an express grant of jurisdiction and waiver of sovereign immunity designating an alternative forum for adjudication of claims traditionally belonging in the Claims Court. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 n. 8 (D.C.Cir.1985).

## B. The Reimbursement Claim under the Tucker Act

The provision of the Tucker Act concerning claims over $10,000 states:

> The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491 (1982). Three of the four grounds for relief set forth by the Commonwealth, the contractual, statutory and equitable claims, call for Tucker Act analysis. We begin with the contract claim.

The Commonwealth claims that "Title XIX together with HHS approval of a state Medicaid plan create a ... contractual commitment that the Federal government will reimburse a state for all 'legitimate'

---

**4.** When speaking of the Tucker Act generally, many courts have referred to its grant of jurisdiction to the Claims Court for nontort claims over $10,000 as "exclusive" or "sole." *See e.g., Air Force Exchange Service v. Sheehan*, 456 U.S. 728, 734–35 n. 5, 102 S.Ct. 2118, 2122 n. 5, 72 L.Ed.2d 520 (1982); *United States v. City of Kansas City, Kansas*, 761 F.2d at 608; *Graham v. Henegar*, 640 F.2d 732, 734–35 & n. 6 (5th Cir.1981). Many authorities have more specifically stressed that Claims Court jurisdiction over contract-based claims over $10,000 is ex-

clusive. *See, e.g., United States v. United Continental Tuna Corp.*, 425 U.S. 164, 172, 96 S.Ct. 1319, 1324, 47 L.Ed.2d 653 (1976); *American Science & Engineering, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir.1978); 17 Wright, Miller & Cooper, Federal Practice & Procedure § 4101 at 210 (1978). This majority view has recently been challenged. *See Pacificorp. v. FERC*, 795 F.2d 816, 826 (9th Cir.1986) (Wallace, J., concurring in part); *Bor-Son Building Corp. v. Heller*, 572 F.2d 174, 182 n. 14 (8th Cir.1978).

Medicaid expenditures." Petitioner's brief at 24. We must determine whether this claim falls within the "contracts" branch of Tucker Act jurisdiction. In *Diamond v. United States*, 657 F.2d 1194 (Ct.Cl.1981), the Court of Claims held that "the asserted existence of a contract" was sufficient to put the case within its jurisdiction. *Id.* at 1197; *See also Merritt v. U.S.*, 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925) (no Tucker Act jurisdiction where petitioner "does not allege any contract, express or implied in fact"). In *Diamond*, after holding that it had jurisdiction, the court went on to find that there was no contract in the case and dismissed the claim. It would seem, therefore, that whatever the merits of the Commonwealth's claim that HHS is contractually bound to provide reimbursement for the court-ordered abortions, the Claims Court has jurisdiction of the claim under the Tucker Act.[5]

Tucker Act jurisdiction in this case may also appropriately rest on the Claims Court's jurisdiction of claims "against the United States founded either upon the Constitution, or any act of Congress, or any regulation of an executive department." 28 U.S.C. § 1491. The classic explication of these words is found in *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599 (1967):

But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. ... In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.

*Id.* 372 F.2d at 1007. This analysis of the noncontractual bases of Tucker Act jurisdiction was quoted approvingly by the Supreme Court in the recent case of *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), where the Court said that "the claimant must demonstrate that the source of substantive law he relies upon ' "can fairly be interpreted as mandating compensation by the federal government for the damage sustained." ' " *Id.* at 216–17, 103 S.Ct. at 2967–68 (quoting *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (quoting *Eastport*, 372 F.2d at 1009)).

The Commonwealth draws our attention to the Supreme Court's recent differentiation of "reimbursement" from "damages." *Burlington School Committee v. Department of Education*, 471 U.S. 359, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985). The Court's statement, however, made in the context of court-ordered reimbursement to parents of handicapped children under 20 U.S.C. § 1415(e)(2), does not affect jurisdictional principles under the Tucker Act. The *Eastport* decision makes clear that the Tucker Act's jurisdictional requirement is that a statute simply grant the right to be

---

**5.** We are aware that the D.C. Circuit has reached the opposite result in a recent case challenging an HHS disallowance under Title XX of the Social Security Act. In *Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441 (D.C.Cir.1985), the D.C. Circuit held that there was no contract-based Claims Court jurisdiction. It does not appear from our reading of the opinion whether Maryland ever *claimed* a breach of a contractual obligation.

We note, in passing, that in *United States v. Hughes Housing Nursing Home, Inc.*, 710 F.2d 891, 893 (1st Cir.1983), we found to be a "useful analogy" the invocation by the district court of a contract framework to describe the relationship between the federal government and a private health care provider who was sued for having received Medicare overpayments. We said there that "the Medicare statutes, rules and regulations create the basic 'contractual terms' that the government claims the provider breached." *Id.* We express no opinion on the ultimate relevance of this analogy insofar as it may relate to the *merits* of the instant case.

paid. In some cases, such payment will take the shape of damages, as was the case in *Mitchell* and in *Eastport* itself; in other cases, however, the monetary relief will simply be promised reimbursement, subsidization or payment, as was the case in *Whitecliff, Inc. v. United States,* 536 F.2d 347, 210 Ct.Cl. 53 (1976) (reimbursement), *New York Airways, Inc. v. United States,* 369 F.2d 743, 177 Ct.Cl. 800 (1966) (subsidization), and *Radium Mines, Inc. v. United States,* 153 F.Supp. 403, 139 Ct.Cl. 144 (1957) (payment).

An example of a successful claim of this kind can be found in *Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961) (cited in *Eastport,* 372 F.2d at 1008), where the Supreme Court reversed a decision of the Court of Claims denying accrued pay to servicemen who had collaborated with the North Koreans after being taken prisoner. The Court found that the government was obliged to pay under the terms of a statute which said that captured servicemen were entitled to receive active duty pay for the period of their imprisonment.

██ In this case, the Commonwealth has argued that both statutes and regulations mandate payment of the expenses incurred in providing the court-ordered abortions. The Commonwealth cites 45 C.F.R. § 205.-10(b)(3) which states that "Federal financial participation is available for ... [p]ayments of assistance within the scope of Federally aided public assistance programs made in accordance with a court order," as well as 42 U.S.C. § 1396b(a), which states that "the Secretary ... shall pay to each State which has a plan approved under this subchapter ... an amount equal to the Federal medical assistance percentage ... of the total amount expended ... as medical assistance under the State plan." We must consider whether these provisions could be "fairly interpreted" as mandating payment to the

Commonwealth so as to create jurisdiction in the Claims Court.

A preliminary issue concerns the depth of analysis required by the *Eastport* "fair interpretation" test. We believe that an *Eastport* jurisdictional inquiry should not reach the merits of the statute-based claim for payment. Rather, *Eastport* provides for a preliminary inquiry designed to weed out cases which rely upon statutes which under no interpretation authorize the payment of money by the federal government. As the *Eastport* opinion indicates, the initial jurisdictional issue is whether the statute itself could be the source of damages or whether "some other principle of damages has to be invoked for recovery." 373 F.2d at 1008. Thus, in *Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114, the Supreme Court found that the Court of Claims lacked jurisdiction over claims for back pay because the statute relied upon could not be "fairly interpreted" to authorize the payment of back pay as a remedy for statutory violations. The general nature of this inquiry means that a case may fall within the jurisdiction of the Claims Court because the statutes relied upon do authorize the payment of money, *e.g., Whitecliff, Inc. v. United States,* 536 F.2d 347, 351, 210 Ct.Cl. 53 (1976) ("the Medicare legislation, fairly read, mandates appropriate payment to providers"), but may still be lost on the merits because the statutes and regulations do not authorize payment under those particular circumstances, *e.g., Appalachian Regional Hospitals, Inc. v. United States,* 576 F.2d 858, 866–68 (jurisdiction over a provider dispute established by *Whitecliff,* statute and regulations; reimbursement claim denied on the merits).

Under this view of the *Eastport* inquiry, we believe that either of the provisions cited by Commonwealth could be "fairly interpreted" as mandating the payment of money by the federal government as a general proposition.[6] This suffices to

---

6. We note that the D.C. Circuit in *Maryland Department of Human Resources v. Department of Health and Human Service,* 763 F.2d at 1451, held that the claims at issue there for reimbursement of expenses under Title XX of the Social Security Act could not be "fairly inter- preted" as mandating compensation and did not, therefore, fall under the statutory branch of the Claims Court's Tucker Act jurisdiction. We are not sure whether this determination is of any relevance to our determination that certain provisions in Title XIX of the Social Security

bring the statutory claims for reimbursement within the scope of the Tucker Act and the jurisdiction of the Claims Court. We, of course, express no opinion as to whether, under these circumstances, the federal government is under an obligation to reimburse the Commonwealth.

■ We turn now to the Commonwealth's equitable claim. The Commonwealth argues that it is not fair to impose upon it the entire cost of the court-ordered abortions when this obligation was imposed upon it solely because of its participation in the Medicaid program, which has, as its "cornerstone," "financial participation by both the Federal Government and the participating State." *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980). The Commonwealth also points to our opinion in *Kozera v. Spirito*, 723 F.2d 1003 (1st Cir.1983), where, in considering the AFDC system, we said: "[A] scheme of cooperative federalism ... is ill-served when the Secretary of HHS seeks to avoid sharing with the states both the burdens of defending beneficiary suits and the financial consequences of an adverse judgment." *Id.* at 1011.

Claims for monetary relief based upon equitable theories also fall within the jurisdiction of the Claims Court under the Tucker Act. "This continued assumption that we can properly use equitable theories in passing upon suits for monetary awards is grounded firmly on the Tucker Act's history, on unquestioned Supreme Court cases and on Court of Claims' decisions; we reaffirm both the practice and the principle." *Pauley Petroleum Inc. v. United States*, 591 F.2d 1308, 1316–17, 219 Ct.Cl. 24, *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). Thus, the Claims Court may properly adjudicate the Commonwealth's claims based on contractual, statutory and equitable theories.

## IV. INTERPRETATION OF THE INJUNCTION

The Commonwealth's fourth and final basis for relief is our injunction and Federal Rule of Civil Procedure 65(d), which states in pertinent part:

> Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

The Commonwealth contends that our injunction ordering the provision of medically necessary abortions to Medicaid-eligible women is binding upon the federal government under Rule 65(d) because, as a partner in the Medicaid program and the enacter of the Hyde Amendment, the federal government is "in active concert" with the Commonwealth.

We hold that we have jurisdiction to rule on the merits of this claim, unlike the claims discussed in Part III. It is our injunction that the Commonwealth asks us either to interpret or to reform. We base our jurisdiction to consider this claim upon the propriety of our having issued the injunction in the first place. Having reviewed the injunction, we reject the Commonwealth's arguments on the merits.

■ It was certainly not our intention at the time the injunction was issued to require federal participation in these court-ordered expenditures. Moreover, a nonparty can only be bound by an injunction if it is legally identified with a party to the injunction. *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980). HHS and the Commonwealth may be closely associated to the point of legal identification with regard to some Medicaid

---

Act could be "fairly interpreted" as mandating compensation. The D.C. Circuit did not address any specific statutory language in Title XX and, as a result, its analysis took a very different tack. Without a detailed analysis of Title XX, it is impossible to determine whether the approach taken by the D.C. Circuit to the *Eastport* inquiry is actually incompatible with our ap-

proach or whether it simply reflects a different statutory base. Our approach follows that of the Claims Court in cases involving Title XVIII of the Social Security Act, *e.g.*, *Whitecliff*, 536 F.2d at 351, where the Court of Claims accepted jurisdiction over Medicare provider reimbursement disputes based upon the statute's authorization of payment.

matters; this is clearly not, however, the case here. We based our issuance of the injunction on the premise that, while the Hyde Amendment prohibited the federal government from paying for such abortions, we were not then convinced that the Commonwealth was not obligated to do so.[7]

Since we have found that the district court did not have jurisdiction over the Commonwealth's contractual, statutory and equitable claims for relief, we vacate the judgment below as to those matters. We remand to the district court to transfer the Commonwealth's contractual statutory and equitable claims to the Claims Court under 28 U.S.C. § 1631 (1982).

*Affirmed in part, vacated in part, and remanded for transfer to the Claims Court.*

No costs.

COFFIN, Circuit Judge, concurring.

I concur in the judgment but write to clarify my views on two points.

First, I agree with the majority that the Commonwealth's prayer for declaratory relief falls outside the APA's waiver of sovereign immunity for suits in federal district court because the requested declaration— that the cost of the court-ordered abortions is a reimbursable Medicaid expense—is unlikely to have any significant prospective effect upon the ongoing grant-in-aid relationship between the Commonwealth and the United States. That is, I see this case as a rare if not a unique one, particularly after the merits of this litigation are finally resolved. My decision does not, however, rest upon a finding that the Commonwealth's "prime objective" in filing suit was monetary rather than declaratory relief. In my view, the Commonwealth's subjective motivations are not only impossible to glean but also irrelevant to the sovereign immunity question, for if the Com-

monwealth had articulated a claim for declaratory relief with significant prospective effect, the district court would have had power to grant appropriate declaratory relief even if the Commonwealth's motivations were primarily monetary. *See State of Minnesota by Noot v. Heckler,* 718 F.2d 852, 857–860 (8th Cir.1983).

Second, I perceive no contract claim sufficient to invoke the exclusive jurisdiction of the Claims Court in this case. Indeed, the Commonwealth's amended complaint does not even contain an allegation of contract. Rather, the complaint alleges that the Commonwealth provided the funds in question not pursuant to a contract, but rather, "solely in compliance with the federal court orders" issued pending resolution of the process of statutory interpretation. Record Appendix at 172. Under these circumstances, I think it unwise to imply a contractual basis for Tucker Act jurisdiction. *See Bennett v. Kentucky Department of Education,* 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985) ("Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."); *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1449 (D.C.Cir.1985) (Claims that "arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties.... are not contract claims for Tucker Act purposes.").

---

7. Our original injunction stated that we found Preterm's position "not patently insubstantial" and that we would therefore "preserv[e] the status quo" until the case was decided. In *Preterm, Inc. v. Dukakis,* we expressed our understanding of Preterm's position thus:

Plaintiffs contend that the Hyde Amendment must be construed ... as authorizing federal

funds for certain limited categories of abortions and thus shifting the total cost to the states of providing those abortion services not funded by the Hyde Amendment but nonetheless required by the Medicaid Act.

591 F.2d at 127.